# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| Gateway Access Solutions, Inc. | : | Bankruptcy No.: 5-07-50051RNO |
| Debtor | : | |

*************************************************************************

| | | |
|---|---|---|
| Andrew C. Nester, Benjamin C. Steele, David F. Wiener, Steele and Associates and Anchor Bay Corporation, | : | |
| Movants | : | |
| vs. | : | Motion to Convert to Chapter 7 Pursuant to 11 U.S.C. § 1112(b) |
| Gateway Access Solutions, Inc., | : | |
| Respondents | : | |

## OPINION[1]

Presently pending before the Court is the Movants' Motion to Convert the instant small business Chapter 11 case to a Chapter 7 case pursuant to 11 U.S.C. § 1112(b)(1).[2] A protracted hearing was held on September 13, 2007 at which the Debtor's sole corporate officer, S. Mark Poler, testified regarding the current status of the company, the bankruptcy, and any projected business plan. The Debtor also cross examined the Movants concerning their motives for filing the instant Motion.

Pursuant to § 1112(b)(3), this decision is issued within fifteen days of the commencement of the conversion hearing. The Court considers only matters of record as of the date of the

---

[1]Drafted with the assistance of law clerk, Kathryn F. Evans, Esquire.

[2]Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended and currently effective.

-1-

conversion hearing, September 13, 2007. For the reasons stated herein, the Court finds the Movants established "cause" pursuant to § 1112(b)(1)&(4) and that the Debtor failed to establish sufficient "unusual circumstances" as to why the case should not be converted under § 1112(b)(2). For the reasons stated below, the Court finds it would be in the best interest of the creditors and the estate to convert the instant case to one under Chapter 7.

## I. Jurisdiction

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334 and 157(b)(2)(A).

## II. Background

This Chapter 11 case was filed on January 9, 2007. The Debtor qualifies as a small business as that term is defined in § 101(51D)[3] and all the accelerated deadlines and duties attendant to being a small business debtor apply herein. *See generally* 11 U.S.C. §§ 308, 1116 & 1121(e). To date, no disclosure statement or plan of reorganization has been filed despite the exclusivity time period during which only the Debtor could file a plan having lapsed with no motion to extend it. The final deadline for filing a plan of reorganization expires on November 5, 2007.

---

[3] (51D) The term "small business debtor"--
(A) subject to subparagraph (B), means a person engaged in commercial or business activities (including any affiliate of such person that is also a debtor under this title and excluding a person whose primary activity is the business of owning or operating real property or activities incidental thereto) that has aggregate noncontingent liquidated secured and unsecured debts as of the date of the petition or the date of the order for relief in an amount not more than $2,190,000 (excluding debts owed to 1 or more affiliates or insiders) for a case in which the United States trustee has not appointed under section 1102(a)(1) a committee of unsecured creditors or where the court has determined that the committee of unsecured creditors is not sufficiently active and representative to provide effective oversight of the debtor; and
(B) does not include any member of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,190,000 (excluding debt owed to 1 or more affiliates or insiders).

The Movants in this case include: Andrew C. Nester, former President and Director of the Debtor who resigned on June 23, 2006; Benjamin C. Steele, former Chief Financial Officer of the Debtor who resigned on June 23, 2006; and, David F. Wiesner, former Director of the Debtor who resigned on June 23, 2006. Both Nester and Wiesner have filed Proofs of Claim in this case seeking a total of over $196,000.00. The other two Movants are Steele & Associates LLC and Anchor Bay Corporation who have both filed substantial Proofs of Claim in the case seeking over $426,000.00 (collectively "Movants").

The Debtor's primary assets consist of FCC licenses and leases to operate wireless broadband services. The Debtor's Schedules value the lease rights at $1,097,206.00. Schedule D lists secured claims of $282,288.19; Schedule E lists priority claims of $121,336.48; and, Schedule F lists unsecured claims of $1,499,179.87. Thus, the total scheduled liabilities are less than the $2,000,000.00 debt ceiling for a small business debtor. 11 U.S.C. § 101(51D).

The Debtor, Gateway Access Solutions, Inc. ("Debtor"), was incorporated under the laws of Nevada and currently has only one member on its Board of Directors, Dr. S. Mark Poler ("Dr. Poler"). Dr. Poler testified that he appointed himself to the position of corporate secretary[4]. Dr. Poler has been a full time anaesthesiologist for Geisinger Health System, a health care provider, for the past seventeen years. When discussing his work habits, Dr. Poler testified he works six to seven days a week at the hospital and feels guilty if he puts in less than eight hours each day. Dr. Poler testified that, in addition to his hospital work, he devotes an additional forty hours a week to duties for the Debtor working from home.

---

[4]No formal actions were taken to appoint Dr. Poler as he is the only board member and the by-laws of the Debtor allowed him to appoint himself to the role of secretary. He testified he chose the position of secretary when the corporation needed to renew its Nevada corporate registration and needed to list at least one officer of the Debtor. The Debtor has not had any other formal officer since the individual Movants resigned in June of 2006.

-3-

The Debtor also has an "acting president," Gary Semans ("Semans"), who was originally employed as a consultant through his company, Popnet. Although it is not completely clear from the record what the role of "acting president" entails, the record reflects that Semans is in charge of negotiating contracts on behalf of the Debtor, has limited authority to sign those contracts, and has no authority to sign checks. Semans has had varying health problems during this case. Despite the state of Semans' health, Dr. Poler maintains that Semans has had an active email and telephonic presence concerning the Debtor's affairs and is still devoting many hours a week to the Debtor. In addition to a corporate secretary and acting president, the Debtor employs one other full time employee and one other part time employee. The Debtor has no present intention to hire any additional management or sales representatives.

### III. Discussion

**(A) 11 U.S.C. § 1112(b)**

The Movants are seeking to convert this case to a Chapter 7 case pursuant to § 1112(b)(1) which was recently redrafted by Congress as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"). Section 1112(b)(1) now provides:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court <u>shall</u> convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause. (Emphasis added).

Prior to the 2005 BAPCPA amendments, this Subsection of the Bankruptcy Code

-4-

provided, in part, that:

> . . . the court <u>may</u> convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate for cause, including . . . (Emphasis added) 11 U.S.C. § 1112(b) (prior to 2005 amendments).

Thus, the statutory language has been changed from permissive to mandatory. The amendments to § 1112 limit the Court's discretion to refuse to dismiss or convert a Chapter 11 case upon a finding of cause. *In re 3 Ram, Inc.*, 343 B.R. 113, 118 (Bankr. E.D.Pa. 2006); also see *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007).

Also, a learned commentator has noted:

> As amended in 2005, section 1112(b) materially circumscribes the court's discretion to convert or dismiss a chapter 11 case for cause in several important ways.

7 Collier on Bankruptcy, ¶1112.04(1) at 1112-19 to 1112-20 (15th ed. rev'd 2007).

Still, as quoted above, conversion or dismissal may be disallowed if the Debtor specifically identifies "unusual circumstances" which establish conversion is not in the best interest of creditors. Such circumstances are not defined in the statute. *See* 11 U.S.C. § 1112(b).

Pre-BAPCPA, § 1112(b) listed ten illustrative examples of "cause" for a Chapter 11 case to either be dismissed or converted to a Chapter 7 liquidation. 11 U.S.C. § 1112(b)(1)-(10) (prior to 2005 amendments).

Under BAPCPA, sixteen illustrative examples of "cause" are listed. Section 1112(b)(4) provides:

> (4) For purposes of this subsection, the term 'cause' includes--
>
> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

-5-

(B) gross mismanagement of the estate;
(C) failure to maintain appropriate insurance that poses a risk to the estate or to the public;
(D) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
(E) failure to comply with an order of the court;
(F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
(G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
(H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
(I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;
(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;
(K) failure to pay any fees or charges required under chapter 123 of title 28;
(L) revocation of an order of confirmation under section 1144;
(M) inability to effectuate substantial consummation of a confirmed plan;
(N) material default by the debtor with respect to a confirmed plan;
(O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and
(P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

We must now apply these new standards to the facts presented.

### (B) 11 U.S.C. § 1112(b)'s Burden Shifting

Pursuant to § 1112(b)(1), the initial burden lies with the Movants to establish "cause" for conversion. *See* 11 U.S.C. § 1112(b)(1). As noted above, a list of what constitutes "cause" is found in § 1112(b)(4). Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should "consider other factors as they arise." *In re Brown*, 951 F.2d 564, 572 (3d Cir.

-6-

1991) *citing* S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5903; H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6362.

If the Movants establish "cause", then the burden shifts to the Debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to § 1112(b)(1)'s mandatory conversion. Congress explained the exception, stating it only applies if: "(1) the debtor or a party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within the time periods set forth in section 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time." H.R. Rep. No. 109-31(I) at 94 (April 8, 2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198.

**(C) Movants Have Established Cause Under 11 U.S.C. § 1112(b)(4)**

As noted above, "cause" is defined by a non-exhaustive list of sixteen factors enumerated in § 1112(b)(4). The applicability of the factors is partly dependent on where in the bankruptcy reorganization process we find the debtor. For example, how old is the case? Has exclusivity expired? Has a disclosure statement or, in a small business case, a plan containing adequate information, been approved?

Here, the Debtor allowed exclusivity to expire on July 9, 2007 and has not filed a plan or disclosure statement. The Movants' conversion Motion largely focuses upon:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; . . .

> (B) gross mismanagement of the estate; . . .
> (D) unauthorized use of cash collateral substantially harmful to 1
> or more creditors; . . .
> (I) failure timely to pay taxes owed after the date of the order for
> relief or to file tax returns due after the date of the order for
> relief; . . .
> (J) failure to file a disclosure statement, or to file or confirm a plan,
> within the time fixed by this title or by order of the court; . . .

There are no outstanding allegations that the Debtor has failed to timely file reports or attend court mandated hearings such as the 341 hearing, nor is there any allegations that the Debtor is uninsured. Dr. Poler testified the Debtor was current in its tax payments and the deadlines to file and confirm a plan have not yet expired making Subsections (I) and (J) inapplicable grounds for cause in this instance. Lastly, there have been no allegations of misuse of cash collateral in a manner that would substantially harm any of the creditors. Therefore, the Court's inquiry will focus on whether the Movants have established cause under Subsections (A) or (B) of § 1112(b)(4).

### (D) 11 U.S.C. § 1112(b)(4)(A) Substantial or Continuing Loss or Diminution of the Estate and Absence of a Reasonable Likelihood of Rehabilitation

The language in new § 1112(b)(4)(A), "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" is almost identical to the pre-BAPCPA amendment § 1112(b)(1)'s provision of "continuing loss to or diminution of the estate and absence of reasonable likelihood of rehabilitation." Therefore, the Court finds that the former case law expounding on former § 1112(b)(1) is equally applicable to new § 1112(b)(4)(A). In a 1991 decision, the Third Circuit summarized the precedent on this factor:

> The Supreme Court has said that "[h]owever honest in its efforts
> the debtor may be, and however sincere its motives, the District
> Court is not bound to clog its docket with visionary or
> impracticable schemes for resuscitation." *Tennessee Publishing*

> *Co. v. American Nat'l Bank*, 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81
> L.Ed. 13 (1936). "[T]here must be 'a reasonable possibility of a
> successful reorganization within a reasonable time.'" *United Sav.
> Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 376, 108
> S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). "Courts usually require the
> debtor do more than manifest unsubstantiated hopes for a
> successful reorganization." *In re Canal Place Ltd. Partnership*,
> 921 F.2d 569, 577 (5th Cir.1991). *In re Brown,* 951 Fed.2d 564,
> 572 (3d Cir. 1991).

Thus, the inquiry here is twofold. First, the Court must look at the track record of the Debtor to determine if it is suffering losses or making gains. Second, the Court must determine whether rehabilitation is likely given the evidence presented at hearing.

The Debtor admits its monthly operating reports reflect a downward trend, but urge the Court not to look at the current operating income but rather at the value of the Debtor's assets which it hopes to sell. While the record is replete with Dr. Poler's references to negotiations for asset sales and potential new customers, very few details were elicited at the conversion hearing. The Court notes that only one potential buyer was referred to by name despite the record in the case being sealed.[5] Further, the Debtor did not offer any documentary evidence at the hearing; no draft plan, no financial projections nor any purchase offers. The Court recognizes the genuine desire Dr. Poler has for the company to succeed, and the Court does not question his intentions. However, a majority of his answers were based on optimistic hypothetical projections of undocumented future deals and unnamed future customers. For example, when asked on direct examination what the Debtor would require to reorganize and come out of bankruptcy, Dr. Poler replied that if one made optimistic projections it would take three to four months after a cash infusion to buy new equipment and serve additional customers; however, if

---

[5]All other potential buyers and customers were referred to in very generalized terms such as "a nationally known company" or customers in rural communities or large companies who were said to have contacted the Debtor.

Case 5:07-bk-50051-RNO    Doc 256    Filed 09/24/07    Entered 09/24/07 14:30:03    Desc
Main Document      Page 9 of 20

one made less optimistic projections, it would take nine to twelve months to become cash-flow positive on a regular basis.

When asked on cross-examination if his projections could be substantiated by anything in writing, Dr. Poler admitted they could not, pointing out that the Debtor has not recently focused on projections stating it was "[a] very small company. We have only so much time and energy, and we have not spent time in recent months on making projections. We focused on the business of keeping the operations going and addressing the issues of the Court." (Audio Record of 9/13/07 at 4:07 p.m.). When pressed further as to the existence of any business model, Dr. Poler stated that the business model could not be discussed at the hearing because "we don't have any of those models here . . . we can't even begin to discuss them. That sort of cash flow and business model is a very complicated thing. It's very difficult to discuss when you are actually working in the spreadsheet much less in very round ambiguous terms in conversation." (Audio Record of 9/13/07 at 4:07 p.m. to 4:08 p.m.). When asked on cross examination why those models were not produced even though they were explicitly asked for in discovery, Dr. Poler had no explanation.

When asked about future business plans of the Debtor, Dr. Poler discussed selling certain leases for capital and possibly expanding their business dealings with Geisinger Health System, a health care provider to whom the Debtor provides internet service. He also mentioned possibly acquiring a cash-flow positive business with one thousand customers from another corporation who no longer wanted to participate in the wireless internet market. Ultimately, Dr. Poler admitted that many of the "potential customers" the Debtor had contacted or been contacted by would not even commence negotiations until after it had emerged from bankruptcy. No

-10-

documentation was produced by the Debtor - no commitment letters, no contracts, no emails. Neither were any other witnesses produced to substantiate any of the claims made by Dr. Poler regarding the negotiations with other companies or potential customers.[6] An exhibit introduced at hearing listed a total of twenty-two customers. Dr. Poler testified that new customer charges range from $39.99 to $119.00 per month. (Movants' Exhibit No. 14).

The Debtor asks the Court to rely solely on Dr. Poler's testimony as grounds for not converting the case. In construing Dr. Poler's credibility, the Court notes that Dr. Poler's records show, post-petition, he has loaned the Debtor in excess of $119,000.00. (Movants' Exhibit No. 13). Further, Geisinger Health System, Dr. Poler's primary employer, is using the Debtor for some of its internet service. Dr. Poler is also scheduled as a pre-petition creditor with claims totaling over $475,000.00. He also acknowledged that interruption of internet services from the Debtor to his primary employer, Geisinger Health System, would be "awkward". The Court cannot ascribe the same weight to his testimony that it would give to that of a disinterested accountant or even a salaried, non-creditor officer or director.

Based upon the above, the Court finds that there is an absence of a reasonable likelihood of rehabilitation of the Debtor in Chapter 11.

With regard to the other prong of § 1112(b)(4)(A), whether the Debtor has suffered continuing losses or diminution of the estate, the Court looks to both the financial prospects of the Debtor and the financial records filed with the Court. The track record of the Debtor suggests a pattern of declining assets and substantial continuing losses. Negative cash flow and

---

[6]The Court acknowledges Debtor's post-trial offer to produce further information under seal, but notes that this is an inappropriate request as the record was closed on September 13, 2007 when the parties rested their respective cases.

-11-

an inability to pay current expenses as they come due can satisfy the continuing loss or diminution of the estate standard for purposes of § 1112(b). *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003); *In re Motel Properties, Inc.*, 314 B.R. 889, 894 (Bankr. S.D.Ga. 2004); *In re Route 202 Corp. t/a Lionti's Villa*, 37 B.R. 367, 374 (Bankr. E.D.Pa. 1984); and *In re Galvin*, 49 B.R. 665, 669 (Bankr. D.N.D. 1985) (Post-petition negative cash flow is considered by courts to be evidence of continuing losses.).

At the conversion hearing, the Debtor's October 31, 2006 Financial Statement was admitted into evidence. (Movants' Exhibit 11). The Financial Statement shows cash of $384,427.00 on October 31, 2006. The Debtor's schedules show a combined checking account balance of $272,649.06, presumably as of the January 9, 2007 petition date. At the time of the conversion hearing, the Debtor had filed a total of seven monthly operating reports. The reports, most of which were amended, were introduced into evidence. They show a sharp decline in Debtor's cash position. The amended January report shows cash beginning of month of $125,739.00. The amended June report shows cash beginning of month of $11,870.00. No accountant or other expert supplied testimony concerning the Debtor's financial condition.

From January 1, 2007 to July 31, 2007, the Debtor's earnings from accounts receivable and sales totaled $30,671.00. The Debtor's disbursements during this period totaled $335,800.00. Over the same time period, the Debtor's amended monthly reports show post-petition loans totaling $172,230.00. Further, a ledger prepared by Dr. Poler was admitted into evidence and shows post-petition borrowings of $233,000.00. (Movants' Exhibit No. 13).

The above facts and figures clearly indicate that the estate is diminishing rapidly at the expense of the creditors. Further troubling is the extensive administrative costs from

-12-

professional fees that are accumulating as the case lingers in Chapter 11. The Court notes fee applications have been filed by the Debtor's professionals, as of the hearing date, totaling approximately $115,000.00. The applications have not been approved and the figures are net of retainers. The Court is troubled that the accruing post-petition professional claims are not accounted for in Debtor's monthly reports. The post-petition loans detailed above could also subject the Debtor to further administrative claims. The Court finds there is a substantial and continuing diminution of the estate.

**(E)  Gross Mismanagement of the Estate**

Another major impediment the Court sees to the Debtor's rehabilitation is the lack of a focused reorganization management team. Failure to maintain an effective corporate management team has been held to constitute gross mismanagement. *In re Broad Creek Edgewater L.P.*, 371 B.R. 752 (Bankr. D.S.C. 2007); *In re Incredible Auto Sales, LLC.*, 2007 WL 1100276 (Bankr. D.Mont. 2007). The Debtor's sole director works no less than six or seven days a week putting in more than eight hours on each of those days as an anaesthesiologist, and then comes home and works another forty plus hours on rehabilitating the Debtor. The only other management is the "acting president" who is ill and was unable to appear at the conversion hearing, either in person or telephonically. The Debtor's time management issues were evidenced when Dr. Poler was asked if he had any business models or projections to present to the Court to establish the likelihood of reorganization. He replied he has not had time recently to work on projections given that he barely had time to keep the business going from day to day and prepare Court documents. The Court recognizes that Semans' health concerns are beyond his control. The time constraints imposed on Dr. Poler by the nature of the anesthesiology

-13-

profession are likewise unavoidable. However, the Court believes that successful restructuring of a business of this size and complexity requires more time and experience than present management can marshall.

It was also fairly evident from Dr. Poler's testimony that he was not closely monitoring the monthly operating reports filed in this case. Illustratively, the monthly operating reports listed the post-petition loans made to the Debtor as coming from Dr. Poler and one other person. He testified at the hearing that the loans really came from over eighteen different people; eleven of whom are his colleagues at his primary employer, Geisinger Health System. Dr. Poler testified that he does not personally review nor sign the monthly operating reports before they are filed. He testified he knows that the accountants prepare them but beyond that he had no knowledge of what process they went through before they were filed. The Debtor's accountants did not testify at the conversion hearing. Dr. Poler later testified that he does not review the monthly operating reports because he relies on Semans to interpret the Debtor's financial information. Only the original January monthly operating report was signed on behalf of the Debtor; the remainder are unsigned. These reports are required by § 308 and should at the very least have been signed by Debtor's counsel.[7]

That being said, of the seven monthly operating reports filed, five had to be amended because of errors. Even the amended monthly operating reports are not completely accurate in that they do not reflect all the post-petition debts of the Debtor, including debts owed to one individual and a company, Net Trepid. The Court believes that accurate reporting and financial transparency are important requirements in the management of a debtor-in-possession.

---

[7]Fed. R. Bankr. P. 9011(a) "every petition pleading, written motion, and other paper . . . shall be signed by at least one attorney of record."

-14-

Case 5:07-bk-50051-RNO    Doc 256    Filed 09/24/07    Entered 09/24/07 14:30:03    Desc
Main Document      Page 14 of 20

A debtor-in-possession is vested with significant powers under the provision of the Bankruptcy Code. As is often the case, those powers come with certain responsibilities. Significantly, a debtor-in-possession owes a fiduciary duty to its creditors. *In re G-I Holdings, Inc.*, 385 F.3d 313, 319 (3d Cir. 2004). A debtor-in-possession has a duty to keep the Court and its creditors informed about the status and condition of its business. *Petit v. New England Mortg. Services, Inc.*, 182 B.R. 64, 69 (D. Me. 1995). The Court has serious questions as to whether the Debtor's monthly reports, and some of the aspects of Dr. Poler's testimony discussed herein, meet the required standards.

Perhaps the greatest indicia of mismanagement is Dr. Poler's practice of making and accepting loans on an oral basis on behalf of the Debtor. Dr. Poler testified that the Debtor was currently being funded by loans from individuals which were made orally and on terms agreed to by him. As of the conversion hearing, the Debtor had received at least $233,000.00 in loans pursuant to these verbal agreements negotiated by Dr. Poler. He testified that the interest rate was 12% per annum. No notes or other loan documents were executed. Apparently, the loans have no agreed to payback date and they will be repaid "when the company is able to repay it." Dr. Poler testified that repayment terms had not been explicitly discussed and stated "these individuals made these contributions to maintaining the solvency of the company voluntarily, understanding that it was uncertain we would be able to repay them but with the expectation that we would." (Audio Record of 9/13/07 at 11:24 a.m.). Further, the Court has never been asked to approve the numerous post-petition loans the corporate Debtor has obtained. There is no evidence that these corporate borrowings were authorized by resolution or other corporate action.

-15-

Some background on the Debtor's efforts concerning post-petition financing is in order. In April 2007, the Debtor filed a Motion (Doc. No. 96 to Case Number 5-07-bk-50051) seeking Court approval for the Debtor to obtain a post-petition secured credit line of $250,000.00 from Dr. Poler. The financing would have borne interest at 10% per annum. The Motion identified Dr. Poler as the lender. Limited objections were filed and, after hearing, Court approval of the proposed secured loan was denied. As part of his testimony at the conversion hearing, Dr. Poler testified that in actuality, the line of credit funds would have been obtained from a number of "participants" whose funds would be funneled through Dr. Poler to the Debtor. This was not disclosed in seeking Court approval of the credit line.

The Court finds that entering into unapproved, unauthorized corporate borrowings on "oral terms" is evidence of gross mismanagement of the estate. These informal borrowings could leave the estate subject to claims by lenders for inflated or fraudulent sums. How would the estate defend against such claims without any loan documentation? Also, one who makes loans to a Chapter 11 debtor without Court approval does so at his peril. *In re Lehigh Valley Professional Sports Club, Inc.*, 260 B.R. 745, 750 (Bankr. E.D.Pa. 2001). There is nothing in the record to show that the Debtor disclosed this risk to the many post-petition lenders.

It is not in the best interests of creditors to allow these practices to continue. Gross mismanagement alone is sufficient grounds for conversion from Chapter 11 to Chapter 7. *In re Incredible Auto Sales, LLC*, 2007 WL 1100276 *5 (Bankr. D.Mont. 2007).

**(F) 11 U.S.C. § 1112(b)(2) Debtor's Burden to Specifically Identify "Unusual Circumstances" Such That it Would Be in the Best Interest of Creditors to Stay in Chapter**

**11**

In order for the Court to deny conversion under § 1112(b)(1), the Court must be able to "specifically identify" factors to establish conversion is not in the best interest of the creditors and the estate. 11 U.S.C. § 1112(b)(2). See also, H.R. Rep. No. 109-31(1) at 94 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198 (Congressional Record stating that § 1112(b) was amended "to mandate that the court convert or dismiss a chapter 11 case . . . the court must specify the circumstances that support the court's finding that conversion or dismissal is not in the best interests of the estate."). The Debtor filed a post-conversion hearing brief which essentially asserts three sets of special circumstances: (1) problems caused by the Debtor's former directors, who are the Movants; (2) reorganizational difficulties caused by the Movants' multiple objections herein; and, (3) the Debtor's post-conversion Brief also argues that conversion is not in the best interests of creditors.

The Court is inclined to believe that "unusual circumstances" under § 1112(b)(2) should be presently existing conditions or facts, rather than perceived past mistakes or events. Debtor argues there exist unusual circumstances in this case because the previous corporate directors grossly mismanaged the corporation. The only evidence the Court has of the alleged previous mismanagement stems solely from the testimony of Dr. Poler, a not impartial witness. The Court is wary to rely exclusively on the testimony of one party to an apparent struggle over the pre-petition direction and management of the Debtor. It is significant to the Court that despite Dr. Poler's repeated criticism of the Movants' actions as directors and officers, no adversary proceeding has been commenced against them by the Debtor. It appears to be a he said/he said battle which the Court is not willing to dissect. Also, it is not uncommon for a change in

corporate management to occur pre-petition. Therefore, the Court is unable to find the alleged past misdeeds of the Movants sufficiently "unusual" for purposes of qualifying for the § 1112(b)(2) exception. The Court also believes that the likelihood of rehabilitation in this case would have been enhanced if Dr. Poler had spent less time looking in the rearview mirror and more time in piloting the Debtor toward a prompt reorganization.

The Debtor's brief also maintains that the Movants have filed unnecessary motions and objections. The Court can take judicial notice of its own docket and finds that the Movants have not filed an inordinate number of objections. Federal Rule of Bankruptcy Procedure 9011 provides a mechanism to address pleadings or papers filed for an improper purpose. The Court also takes judicial notice that the Debtor has not made any motions against the Movants under this Rule. Furthermore, of all the objections filed by the Movants, only one was overruled[8]; the remainder have either been sustained or settled out of Court by stipulation. In fact, the Court finds the Movants' conduct to have been reasonable and notes their willingness to consent to a continuance of the conversion hearing despite the fact they were statutorily entitled to have the Motion heard within thirty days of its filing. 11 U.S.C. § 1112(b)(3). The Movants agreed to the continuance in an effort to allow the Debtor a certain degree of latitude in conducting discovery and arranged to travel from California and Nevada to Pittsburgh on the eve of the conversion hearing to make themselves available for depositions on only one week's notice. The Court does not find that the Movants' post-petition conduct created an "unusual circumstance" justifying allowing the Debtor to remain in Chapter 11.

---

[8] The only objection of the Movants which has been overruled to date was the Movants' Objection to the Rejection of the Pegasus contract. (Doc. No. 70 to Case Number 5-07-bk-50051).

-18-

The Debtor's Brief suggests that it is in the best interests of creditors for the Debtor to remain in Chapter 11 and sell its lease rights. The record suggests otherwise. There was no testimony that any purchaser was interested in buying the Debtor as a going concern. The Court finds that a liquidation by a Chapter 7 trustee will be more likely to yield a greater distribution to creditors than for the Debtor to remain in Chapter 11. The Court believes that the value of the Debtor's assets can be more effectively realized by a Chapter 7 trustee than by the Debtor. Chapter 7 cases generally have lower administrative expenses and bankruptcy trustees are accustomed to consummating the sale of a variety of assets, tangible and intangible. Therefore, conversion is in the best interest of creditors.

### IV. Conclusion

Under BAPCPA, the Court must make a decision which fosters the best interests of creditors. This is not a change from prior law.

It is significant to the Court that four of the five Movants filed Proofs of Claim which total approximately $628,897.00. This sum represents nearly one-third of the scheduled pre-petition debt. The fact that these creditors support conversion is not determinative of the outcome, but it must be given serious consideration.

Ultimately, the Debtor has left the Court to wonder about elements which were its burden to establish. Is there a reasonable likelihood of a rehabilitation? Does the Debtor, in fact, have a plan to reorganize? If so, why keep it secret from the Court and its creditors? Has the Debtor made any financial projections to establish some feasibility to even a skeletal plan? Again, if so, why keep it a secret?

The Court contrasts the Debtor's unsupported speculations as to a rehabilitation against

-19-

the evidence adduced by the Movants. The Debtor introduced no exhibits at hearing; the Movants introduced sixteen exhibits. To be sure evidence is not a counting game, but the Debtor's inability or unwillingness to document or record its transactions bodes poorly for a likely rehabilitation. The monthly reports filed by the Debtor show a continuing diminution of the estate.

As noted above, the Court has found that the value of the assets are not dependent on the Debtor's continued operations. Those operations are only increasing the Debtor's operating losses and its post-petition administrative claims. The Court can imagine a retail case where the value of the debtor's hard assets would be greatly dependent upon the debtor's continued operations; this is not such a case. The Court can also imagine a situation where continued operation of a debtor who provided an exclusive essential service would foster the public interest. Again, this is not such a case.

It is in the best interests of creditors to grant the conversion to Chapter 7 thereby stemming the operating losses and allowing for a prompt and orderly liquidation. This should provide a distribution to creditors in accordance with the Bankruptcy Code's priorities.

An Order consistent with this Opinion will be entered.

Date: September 24, 2007

Robert N. Opel, II, Bankruptcy Judge
*This opinion is electronically signed and filed on the same date.* (BI)